## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**ELDRIDGE LEBLANC**                                    CIVIL ACTION

**VERSUS**

**HONEYWELL INTERNATIONAL,**                    NO. 20-00326-BAJ-RLB
**INC.**

### RULING AND ORDER

Before the Court is Defendant's **Motion for Summary Judgment (Doc. 25)**. The Motion is opposed. (Doc. 26). Defendant filed a Reply Brief. (Doc. 31). For the reasons stated herein, Defendant's Motion is **GRANTED**.

### I. BACKGROUND

This is an employment discrimination case. Plaintiff sued Defendant Honeywell International, Inc. for alleged violations of the Americans with Disabilities Act, the Louisiana Employment Discrimination Law, the Rehabilitation Act, and Title VII of the Civil Rights Act of 1964. (Doc. 1).

Defendant manufactures various chemical products on several hundred developed acres. (Doc. 25-2, ¶ 2; Doc. 26-7, ¶ 2). Defendant hired Plaintiff as an Operating Technician on December 20, 2013. (Doc. 25-2, ¶ 6; Doc. 26-7, ¶ 6). In March 2016, Plaintiff began working in the "Apollo Unit," where his job title remained Operating Technician. (Doc. 25-2, ¶ 7; Doc. 26-7, ¶ 7).

1

As an Operating Technician, Plaintiff operated equipment that regulated the mix, feed, and flow of chemicals in the manufacturing process and collected data and samples as part of routine inspections. (Doc. 25-2, ¶ 8; Doc. 26-7, ¶ 8). The Operating Technician position is a manual labor job. (Doc. 25-2, ¶ 9; Doc. 26-7, ¶ 9).

The manual labor aspect of Plaintiff's job could include "opening and closing of valves, lockout/tag out compliance, and catching samples to bring to the chemical lab." (*Id.*). The job requires frequent bending, stooping, climbing, reaching above shoulder level, crouching, balancing, pushing, and pulling. (Doc. 25-2, ¶ 10; Doc. 26-7, ¶ 10). The physical requirements of the job also involve frequent lifting in the 35 to 50-pound range and occasional lifting in the 51 to 74-pound range. (Doc. 25-2, ¶ 11; Doc. 26-7, ¶ 11). Plaintiff spent approximately 60% of his time standing, 25% walking, and 15% sitting. (Doc. 25-2, ¶ 12; Doc. 26-7, ¶ 12). Additionally, part of Plaintiff's job involved climbing 220 feet of stairs carrying sample containers, PPE, and other equipment, and climbing scaffolding. (Doc. 25-2, ¶ 13; Doc. 26-7, ¶ 13).

Plaintiff received training on safety precautions because, among other things, the refrigerant manufactured in the Apollo Unit can be a dangerous chemical before it reaches its final stage. (Doc. 25-2, ¶ 14; Doc. 26-7, ¶ 14). Specifically, Plaintiff received training on protocols to follow in the event of a gas leak. (Doc. 25-2, ¶ 14; Doc. 26-7, ¶ 14). Defendant had evacuation routes and shelter in place rooms where employees could escape to so they could be accounted for. (*Id.*). The minimum PPE

for workers in the Apollo Unit is rubber gloves, safety glasses, and earplugs. (Doc. 25-2, ¶ 15; Doc. 26-7, ¶ 15). Sometimes, employees will wear full acid suits. (*Id.*).

On January 8, 2017, Plaintiff was involved in a motor vehicle accident resulting in a spinal injury that included a "bulging disc" in his lower back. (Doc. 25-2, ¶ 22; Doc. 26-7, ¶ 22). Symptoms of the back injury were exacerbated by prolonged lifting, standing, or sitting and were only "relieved by rest," though sometimes even laying down was painful. (Doc. 25-2, ¶ 23; Doc. 26-7, ¶ 23). Plaintiff was prescribed hydrocodone and Flexeril, a muscle relaxant, to control the pain. (Doc. 25-2, ¶ 24; Doc. 26-7, ¶ 24).

On July 14–15, 2018, Steve Shirey, Plaintiff's supervisor, was notified that Plaintiff aggravated his lower back injury during the weekend of July 4, 2018.[1] (Doc. 25-2, ¶¶ 18, 33; Doc. 26-7, ¶¶ 18, 33). On July 16, 2018, Shirey's supervisor, Carlos Navar, Operations Manager, notified Defendant's medical team that they needed to evaluate Plaintiff once he clarified that the injury was non-occupational. (*Id.*).

On July 23, 2018, Plaintiff was evaluated by CORE Occupational, Defendant's third-party medical provider. (Doc. 25-2, ¶ 34; Doc. 26-7, ¶ 34). CORE determined that Defendant needed more information from Plaintiff's personal physician, Dr. Sean Graham, whom Plaintiff was scheduled to visit on July 30, 2018. (*Id.*).

---

[1] The parties' briefs do not clarify how Plaintiff aggravated his lower back injury but indicate that the injury was non-occupational.

Dairie Decoteau, Defendant's on-site occupational nurse, advised Defendant's human resources team and managers that Plaintiff could not be returned to work until he provided the additional information from Dr. Graham. (Doc. 25-2, ¶ 35; Doc. 26-7, ¶ 35).

At his July 30, 2018 visit with Dr. Graham, Plaintiff reported that his pain level was at an 8 out of 10 and that "his right leg felt like it was giving out on him." (Doc. 25-2, ¶ 36; Doc. 26-7, ¶ 36). Based on the July 30, 2018 visit, the information provided by Dr. Graham indicated that Plaintiff had work restrictions which included no lifting over 30 pounds and no frequent bending. (Doc. 25-2, ¶ 37; Doc. 26-7, ¶ 37). Dr. Graham also stated that Plaintiff had "trouble tolerating prolonged sitting and standing" and had "difficulty concentrating and attentiveness due to chronic pain and/or medications prescribed." (*Id.*). Based on these restrictions, which demonstrated that Plaintiff could not perform any of the physical requirements of his job and posed a safety risk to himself and others, Defendant determined, with input from CORE, that the only accommodation available to Plaintiff was additional leave. (Doc. 25-2, ¶ 38; Doc. 26-7, ¶ 38).

Following additional leave, Plaintiff's pain levels were reduced, and he reported that he was able to return to work. Typically, resting and being out of work improved Plaintiff's pain levels. (Doc. 25-2, ¶ 41; Doc. 26-7, ¶ 41). CORE evaluated Plaintiff and cleared him to return to work with no restrictions based on information

provided by Dr. Graham from Plaintiff's September 17, 2018 appointment. (Doc. 25-2, ¶ 42; Doc. 26-7, ¶ 42).

On February 21, 2019, Plaintiff went out on leave for his back again and never returned to work. (Doc. 25-2, ¶ 43; Doc. 26-7, ¶ 43).

On March 13, 2019, Plaintiff sent a "Memorandum" to Defendant stating that he was informed by his physician that "working in my current position as a field chemical operator along with some of the physical duties of my position pose an increased risk of paralysis due to my condition." (Doc. 25-2, ¶ 46; Doc. 26-7, ¶ 46).

On April 8, 2019, Plaintiff requested accommodations including periodic breaks, assistance with turning valves, assistance with climbing stairs, assistance with carrying heavy items, and avoidance of standing for too long. (Doc. 25-2, ¶ 47; Doc. 26-7, ¶ 47). Dr. Graham indicated that Plaintiff's restrictions included limits on repetitive bending, frequent breaks, no lifting greater than 50 pounds, and avoidance of maintaining one position. (*Id.*).

Around the same time, Plaintiff informed Navar that once the bulging disc in his back hit the nerves, "it's not just my back hurting. It gets to a point where sometimes I can't even walk like physically can't walk. It gets that bad." (Doc. 25-2, ¶ 48; Doc. 26-7, ¶ 48).

Based on the information provided by Plaintiff and Dr. Graham, Defendant determined that the only suitable accommodation for Plaintiff was extended leave continuing on past May 20, 2019, even though Plaintiff did not provide a date on

5

which he might be able to return with fewer physical restrictions. (Doc. 25-2, ¶ 50; Doc. 26-7, ¶ 50).

Plaintiff attempted to return to work in November 2019. However, Defendant instructed him to obtain a release from his treating physician and submit it to CORE. (Doc. 25-2, ¶ 51; Doc. 26-7, ¶ 51). On December 3, 2019, Plaintiff presented himself at CORE and presented a form from Dr. Graham that listed work restrictions, as of May 20, 2019. (Doc. 25-2, ¶ 52; Doc. 26-7, ¶ 52). These were the same restrictions he reported in April 2019. (*Id.*). Noting that Plaintiff's restrictions were dated as May 20, 2019, and were vague, the nurse practitioner at CORE did not release Plaintiff to return to work and, instead, instructed Plaintiff to provide Defendant and CORE with additional information from Dr. Graham. (Doc. 25-2, ¶ 53; Doc. 26-7, ¶ 53). The CORE representative told Plaintiff he needed clarification on "1) estimated time of restrictions; 2) clarification of frequent breaks; and 3) what day to return to work." (Doc. 26-7, ¶ 2; Doc. 31-1, ¶ 2). Dr. Graham's medical note from the latest visit in January 2020 was provided to Defendant in March 2021, after Plaintiff filed suit. (Doc. 26-7, ¶ 5; Doc. 31-1, ¶ 5).

Operating technicians, like Plaintiff, could be promoted to Apollo Board Operator, a position responsible for monitoring operating conditions and directing the work of technicians, if they met certain prerequisites. (Doc. 25-2, ¶ 19; Doc. 26-7, ¶ 19). Defendant could not provide Plaintiff with the accommodation of training to become Apollo Board Operator for the following reasons: (1) Plaintiff had

6

not satisfied the prerequisites for the position; and (2) Dr. Graham indicated that Plaintiff could not tolerate prolonged sitting and that his medication affected his concentration. (Doc. 25-2, ¶ 39; Doc. 26-7, ¶ 39).

Plaintiff filed a claim for disability benefits with the Social Security Administration most likely the end of 2019.[2] (Doc. 25-2, ¶ 57; Doc. 26-7, ¶ 57). In a claim filed in March 2020, Plaintiff told the Louisiana Workforce Commission that if he was offered a job, he could not accept it. (Doc. 25-2, ¶ 58; Doc. 26-7, ¶ 58).

## II.    LEGAL STANDARD

A court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on motions for summary judgment, courts are required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Coleman v. Hous. Indep. School Dist.*, 113 F.3d 528, 533 (5th Cir. 1997).

To survive summary judgment, however, the nonmoving party must do more than allege an issue of material fact: "Rule 56(e) . . . requires the nonmoving party to

---

[2] Presumably, neither party could inform the Court of exactly when Plaintiff filed a claim for disability benefits with the Social Security Administration.

go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Auguster v. Vermilion Par. Sch. Bd.*, 249 F.3d 400, 402 (5th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citations and quotation marks omitted). A party that fails to present competent evidence opposing a motion for summary judgment risks dismissal on this basis alone. *E.g., Broussard v. Oryx Energy Co.*, 110 F. Supp. 2d 532, 536 (E.D. Tex. 2000) ("Plaintiff produced no genuine issue of material fact to prevent the granting of Defendant's Motion, and therefore, the Court could grant Defendant's Motion for Summary Judgment on this basis alone.").

## III.   DISCUSSION

### A. The Americans with Disabilities Act—Count I

Plaintiff alleges that Defendant failed to accommodate him in violation of the Americans with Disabilities Act. (*See* Doc. 1). "Under the ADA, it is unlawful for an employer to fail to accommodate the known limitations of an employee's disability." *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 587 (5th Cir.), *cert. denied sub nom. Clark v. Inco Champion Nat'l Sec., Inc.*, 141 S. Ct. 662, 208 L. Ed. 2d 272 (2020) (internal citations omitted). Plaintiff "must prove the following statutory elements to

prevail in [his] failure-to-accommodate claim: (1) [he] is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations." *Id.* (citing *Feist v. La., Dep't of Justice, Office of the Att'y Gen.*, 730 F.3d 450, 452 (5th Cir. 2013)).

Here, the parties do not dispute that Plaintiff was regarded as disabled. Rather, two primary questions are presented by the parties' briefs: (1) whether Plaintiff was a "direct threat" and thus not qualified for the job of Operating Technician; and (2) whether Plaintiff unilaterally terminated the interactive process and voluntarily resigned his employment. The Court will address each in turn.

### i.    Direct Threat

Defendant argues that Plaintiff's back injury posed a direct threat to his safety and rendered him unqualified for the Operating Technician position. (Doc. 25-1, p. 17). Plaintiff fails to oppose Defendant's "direct threat" argument in any way, except to argue that Plaintiff was qualified for the job because he "occupied the position without incident and possessed the necessary certifications required by his position." (Doc. 26, p. 6).

A "qualified individual with a disability" means "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Daugherty v.*

*City of El Paso*, 56 F.3d 695, 696 (5th Cir. 1995), *holding modified by Kapche v. City of San Antonio*, 304 F.3d 493 (5th Cir. 2002) (citing 42 U.S.C. § 12111(8)). The ADA provides that "[employment] qualification standards may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113(3) (internal quotation marks omitted); *see also Sutherland v. Edison Chouest Offshore, Inc.*, No. CV 19-414, 2020 WL 5436654, at *6 (E.D. La. Sept. 10, 2020).

An employer is entitled to a direct threat defense if an employee poses a "significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 342 (5th Cir. 2019) (citing *EEOC v. E.I. Du Pont de Nemours & Co.*, 480 F.3d 724, 731 (5th Cir. 2007) (quoting 42 U.S.C. § 12111(3)); *see also* 42 U.S.C. § 12113(b)). Whether an employer has properly determined that a person poses a direct threat depends on "the objective reasonableness of [the employer's] actions." *Nall*, 917 F.3d at 342 (citing *Bragdon v. Abbott*, 524 U.S. 624, 650 (1998) ("[C]ourts should assess the objective reasonableness of the views of health care professionals without deferring to their individual judgments[.]").

"The direct threat defense must be 'based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence,' and upon an expressly 'individualized assessment of the individual's present ability to safely perform the essential functions of the job[.]'" *Nall*,

917 F.3d at 342 (citing *Chevron U.S.A., Inc. v. Echazabal*, 536 U.S. 73, 86 (2002) (quoting 29 C.F.R. § 1630.2(r)); *see also E.I. Du Pont*, 480 F.3d at 731 ("The employer must make an 'individualized assessment of the individual's present ability to safely perform the essential function of the job.'" (citations omitted)). The U.S. Supreme Court and the Fifth Circuit have "made clear" that an employer's direct threat determination must not result from a "categorical conclusion that an employee with a particular disability cannot safely perform a job." *Nall*, 917 F.3d at 344 (citing *Echazabal*, 536 U.S. at 86); *see also Sutherland v. Edison Chouest Offshore, Inc.*, No. CV 19-414, 2020 WL 5436654, at *7 (E.D. La. Sept. 10, 2020).

The Fifth Circuit in *Nall* prescribed the following framework for evaluating a direct threat defense: "[T]he question is whether there is any evidence in the record that creates a genuine issue of material fact as to whether Defendant meaningfully assessed Plaintiff's ability to perform his job safely and reasonably concluded that he posed a direct threat." *Nall*, 917 F.3d at 344. Whether an employer appropriately makes a direct threat determination depends on the following: (1) whether Defendant conducted a "meaningful assessment" that is individualized and based on the essential functions of the job; and (2) whether that assessment led the employer to reasonably conclude that the employee posed a threat to the safety of himself or others "based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence." *Id.* at 342 (quoting

11

*Echazabal v. Chevron U.S.A., Inc.*, 536 U.S. 73, 86 (2002) (internal quotation marks omitted); *see also Sutherland*, 2020 WL 5436654, at *7.

For the reasons stated below, the Court finds no record evidence creating a genuine issue of material fact as to whether Defendant meaningfully assessed Plaintiff's ability to perform his job safely, or whether Defendant reasonably concluded that he posed a direct threat to the safety of himself or others.

### a. Meaningful Assessment

The Court's determination of whether Defendant meaningfully assessed Plaintiff's ability to perform his job safely turns on whether Defendant made an "individualized assessment" based on the "essential functions" of Plaintiff's job as an Operating Technician. *See Sutherland*, 2020 WL 5436654, at *7. The following functions of Plaintiff's job are undisputed:

> As an Operating Technician, Plaintiff operated equipment that regulated the mix, feed, and flow of chemicals in the manufacturing process and collected data and samples as part of routine inspections. (Doc. 25-2, ¶ 8; Doc. 26-7, ¶ 8).

> The Operating Technician job in the Apollo unit is a manual labor job. The manual labor aspect of Plaintiff's job could include opening and closing of valves, lockout/tag out compliance, and catching samples to bring to the chemical lab. (Doc. 25-2, ¶ 9; Doc. 26-7, ¶ 9).

> The job requires frequent bending, stooping, climbing, reaching above shoulder level, crouching, balancing, pushing, and pulling. (Doc. 25-2, ¶ 10; Doc. 26-7, ¶ 10).

> The physical requirements of the job also involve frequent lifting in the 35 to 50-pound range and occasional lifting in the 51 to 74-pound range. (Doc. 25-2, ¶ 11; Doc. 26-7, ¶ 11).

Plaintiff spent approximately 60% of his time standing, 25% walking, and 15% sitting. (Doc. 25-2, ¶ 12; Doc. 26-7, ¶ 12).

Additionally, part of Plaintiff's job involved climbing 220 feet of stairs carrying sample containers, PPE, and other equipment, and climbing scaffolding. (Doc. 25-2, ¶ 13; Doc. 26-7, ¶ 13).

Defendant also required employees to evacuate rapidly in the event of a gas leak. (Doc. 25-1, p. 17; *see also* Doc. 25-2, ¶ 14; Doc. 26-7, ¶ 14). The following facts are undisputed:

Plaintiff received training on safety precautions because, among other things, the refrigerant manufactured in Defendant's Apollo Unit could be a dangerous chemical before it reaches its final stage. Specifically, Plaintiff received training on protocols to follow in the event of a gas leak. Defendant had evacuation routes and shelter in place rooms where employees could escape to so they could be accounted for. (Doc. 25-2, ¶ 14; Doc. 26-7, ¶ 14).

The minimum PPE for workers in the Apollo Unit is rubber gloves, safety glasses, and earplugs. Sometimes, employees will wear full acid suits. (Doc. 25-2, ¶ 15; Doc. 26-7, ¶ 15).

Defendant contends that because Plaintiff's back injury could prevent him from being able to work and that performing his job could lead to paralysis, Plaintiff's back injury posed a direct threat to his own safety if he continued to perform his job. (Doc. 25-1, p. 17). Defendant asserts that if Plaintiff "is impaired in his ability to move at all, let alone paralyzed or unable to walk, he would be unable to safely evacuate, putting himself and others, including coworkers and first responders, at risk of serious injury or death." (*Id.* at p. 19).

Indeed, Plaintiff emphasizes that "his health conditions prevent[ed] him from performing essential functions of employment and substantially limited major life

activities such as standing, lifting, walking, and working. The same does not appear to be in dispute." (Doc. 26, p. 6).

On the record before it, the Court finds that Defendant conducted a "meaningful assessment" that was individualized and based on the essential functions of Plaintiff's job as an Operating Technician. *See Nall*, 917 F.3d at 342 (quoting *Echazabal v. Chevron U.S.A., Inc.*, 536 U.S. 73, 86 (2002) (internal quotation marks omitted); *see also Sutherland v. Edison Chouest Offshore, Inc.*, No. CV 19-414, 2020 WL 5436654, at *7 (E.D. La. Sept. 10, 2020).

### b. Reasonableness

Turning to whether that assessment led Defendant to reasonably conclude that Plaintiff posed a threat to the safety of himself or others "based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence," the following facts are undisputed:

> On July 23, 2018, Plaintiff was evaluated by CORE Occupational, Defendant's third-party medical provider. CORE determined that Defendant needed more information from Plaintiff's personal physician, Dr. Sean Graham, whom Plaintiff was scheduled to visit on July 30, 2018. (Doc. 25-2, ¶ 34; Doc. 26-7, ¶ 34).

> Dairie Decoteau, Defendant's on-site occupational nurse, advised Defendant's human resources team and managers that Plaintiff could not be returned to work until he provided the additional information from Dr. Graham. (Doc. 25-2, ¶ 35; Doc. 26-7, ¶ 35).

> At his July 30, 2018, visit with Dr. Graham, Plaintiff reported that his pain level was at an 8 out of 10 and that "his right leg felt like it was giving out on him." (Doc. 25-2, ¶ 36; Doc. 26-7, ¶ 36).

Based on the July 30, 2018 visit, the information provided by Dr. Graham indicated that Plaintiff had work restrictions which included no lifting over 30 pounds and no frequent bending. Dr. Graham also stated that Plaintiff had "trouble tolerating prolonged sitting and standing" and had "difficulty concentrating and attentiveness due to chronic pain and/or medications prescribed." (Doc. 25-2, ¶ 37; Doc. 26-7, ¶ 37).

Based on these restrictions, which demonstrated that Plaintiff could not perform any of the physical requirements of his job and posed a safety risk to himself and others, Defendant determined, with input from CORE, that the only accommodation available to Plaintiff was additional leave. (Doc. 25-2, ¶ 38; Doc. 26-7, ¶ 38).

Following additional leave, Plaintiff's pain levels were reduced, and he reported that he was able to return to work. Typically, resting and being out of work improved Plaintiff's pain levels. (Doc. 25-2, ¶ 41; Doc. 26-7, ¶ 41). CORE evaluated Plaintiff and cleared him to return to work with no restrictions based on information provided by Dr. Graham from Plaintiff's September 17, 2018 appointment. (Doc. 25-2, ¶ 42; Doc. 26-7, ¶ 42).

On February 21, 2019, Plaintiff went out on leave for his back again and never returned to work. (Doc. 25-2, ¶ 43; Doc. 26-7, ¶ 43).

Plaintiff sent a "Memorandum" to Defendant stating that he was informed by his physician that "working in my current position as a field chemical operator along with some of the physical duties of my position pose an increased risk of paralysis due to my condition." (Doc. 25-2, ¶ 46; Doc. 26-7, ¶ 46).

On April 8, 2019, Plaintiff requested accommodations including periodic breaks, assistance with turning valves, assistance with climbing stairs, assistance with carrying heavy items, and avoidance of standing for too long. Dr. Graham indicated that Plaintiff's restrictions included limits on repetitive bending, frequent breaks, no lifting greater than 50 pounds, and avoidance of maintaining one position. (Doc. 25-2, ¶ 47; Doc. 26-7, ¶ 47).

Based on the information provided by Plaintiff and Dr. Graham, Defendant determined that the only suitable accommodation for Plaintiff was extended leave continuing on past May 20, 2019, even

though Plaintiff did not provide a date on which he might be able to return with fewer physical restrictions. (Doc. 25-2, ¶ 50; Doc. 26-7, ¶ 50).

Plaintiff attempted to return to work in November 2019. However, Defendant instructed him to obtain a release from his treating physician and submit it to CORE. (Doc. 25-2, ¶ 51; Doc. 26-7, ¶ 51).

On December 3, 2019, Plaintiff presented himself at CORE and gave them a form from Dr. Graham that listed his restrictions, as of May 20, 2019. (Doc 25-2, ¶ 52; Doc. 26-7, ¶ 52). These were the same restrictions he reported in April 2019. (*Id.*). Noting that Plaintiff's restrictions were dated as May 20, 2019, and were vague, the nurse practitioner at CORE did not release Plaintiff to return to work and, instead, instructed Plaintiff to provide Defendant and CORE with additional information from Dr. Graham. (Doc. 25-2, ¶ 53; Doc. 26-7, ¶ 53). The CORE representative told Plaintiff he needed clarification on "1) estimated time of restrictions; 2) clarification of frequent breaks; and 3) what day to return to work." (Doc. 26-7, ¶ 2; Doc. 31-1, ¶ 2).

Dr. Graham's medical note from the latest visit in January 2020 was provided to Defendant in March 2021, after Plaintiff filed suit. (Doc. 26-7, ¶ 5; Doc. 31-1, ¶ 5).

There is no dispute as to whether Plaintiff's medical evaluation was "individualized." The jurisprudence on individualized assessments cautions employers against relying on "perceptions of a disability based on myth, fear or stereotype" and requires them to evaluate employees in their "actual state." *Rodriguez v. ConAgra Grocery Prod.*, 436 F.3d 468, 481 (5th Cir. 2006) (internal quotation marks and alterations omitted); *see also Sutherland v. Edison Chouest Offshore, Inc.*, No. CV 19-414, 2020 WL 5436654, at *8 (E.D. La. Sept. 10, 2020). The undisputed facts indicate that the medical assessments in this case were based on Plaintiff's actual state.

On the record before the Court, and in the face of no opposing argument from Plaintiff, the Court finds that there is no genuine issue of material fact as to whether Defendant's meaningful assessment led it to reasonably conclude that Plaintiff posed a direct threat to the safety of himself or others. *See Nall*, 917 F.3d at 344. The Court notes that "the question is not whether the employer was correct about the risk the employee posed, but instead concerns whether the employer's decision was objectively reasonable based upon the information before it." *Id.* at 346 n.8. Accordingly, Plaintiff was not qualified for the job of Operating Technician. *See Gonzales v. City of New Braunfels, Tex.*, 176 F.3d 834, 838 (5th Cir. 1999) (finding that an employee is not qualified for his job when a doctor "perform[s] an individualized assessment of [the employee's] medical condition and, based on that assessment, conclude[s] that his [condition] prevents" the employee from performing the essential functions of the job.); *see also Sutherland v. Edison Chouest Offshore, Inc.*, No. CV 19-414, 2020 WL 5436654, at *10 (E.D. La. Sept. 10, 2020) (finding that "defendants [were] entitled to summary judgment on their direct threat defense to plaintiff's ADA claim) ("defendants appropriately determined that [plaintiff] was not qualified for the master position").

### c.  Reassignment

The Fifth Circuit has emphasized that an employer is entitled to a direct threat defense if an employee poses a "significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." *Nall v. BNSF Ry. Co.*,

917 F.3d 335, 342 (5th Cir. 2019). As the Court has determined that Plaintiff was not qualified for the job of Operating Technician, the Court turns to whether reassignment to a different job, if reasonable, would have eliminated the direct threat to Plaintiff's safety or the safety of others.

Plaintiff argues that Defendant has not "presented any evidence or documentation indicating it could *not* accommodate [Plaintiff's] disability." (Doc. 26, p. 8 (emphasis added)). However, Plaintiff misunderstands his burden. A plaintiff can establish that he is "qualified" by showing that "either (1) [he] could perform the essential functions of the job in spite of [his] disability," or "(2) that a reasonable accommodation of [his] disability would have enabled [him] to perform the essential functions of the job." *Moss v. Harris Cty. Constable Precinct One,* 851 F.3d 413, 419 (5th Cir. 2017). "[T]he ability to perform a job without risk to one's health or safety is an essential function on its own." *See Sutherland v. Edison Chouest Offshore, Inc.,* No. CV 19-414, 2020 WL 5436654, at *7 (E.D. La. Sept. 10, 2020) (internal quotations omitted). Finally, reassignment to a different job may be a reasonable accommodation, but "[t]he plaintiff bears the burden of proving that an available position exists that he was qualified for and could, with reasonable accommodations, perform." *Moss,* 851 F.3d at 418 (citing *Jenkins v. Cleco Power, LLC,* 487 F.3d 309, 315 (5th Cir. 2007) (citation omitted); *see also Foreman v. Babcock & Wilcox Co.,* 117 F.3d 800, 810 (5th Cir. 1997) ("For the accommodation of a

reassignment to be reasonable, it is clear that a position must first exist and be vacant."). Plaintiff fails to bear this burden.

First, it is undisputed that Defendant could not reassign Plaintiff to the Apollo Board Operator position for the following reasons: (1) Plaintiff had not satisfied the prerequisites for the position; and (2) Dr. Graham indicated that Plaintiff could not tolerate prolonged sitting and that his medication affected his concentration. (Doc. 25-2, ¶ 39; Doc. 26-7, ¶ 39).

Second, Plaintiff's other requested positions involved working on "lower levels" of the unit, Steps One, Two, or Three, which Defendant argued was "completely out of the question" based on the work restrictions provided by Dr. Graham. (Doc. 1, ¶¶ 19–24; Doc. 25-1, p. 23; Doc. 25-2, ¶ 27; Doc. 26-7, ¶ 27). Plaintiff testified in his deposition that his request to work on Step One was a "desperate move" since Step One is a "harder" unit to work in. (Doc. 25-6, p. 38). Plaintiff also testified that working on Steps Two and Three would reduce the number of stairs Plaintiff would have to climb and the amount of lifting Plaintiff would have to complete but would not assist with prolonged sitting. (*Id.* at p. 37–38).

Assuming that there were vacant positions on the "lower levels" of the unit, and assuming that reassignment was reasonable, Plaintiff has not established that he could perform the essential functions of a position on the lower levels. Indeed, working on the lower levels of the unit would not eliminate the need to evacuate rapidly in the event of a gas leak, and the ability to perform a job without risk to one's

health or safety is an essential function on its own. *See Sutherland*, 2020 WL 5436654, at \*7. A reassignment would not eliminate the direct threat to Plaintiff's safety or the safety of others, as described *supra. See Nall*, 917 F.3d at 342.

It is Plaintiff's burden to show that he is qualified under the ADA. *Moss*, 851 F.3d at 419. Because Plaintiff failed to provide evidence showing any reasonable accommodations that would have enabled him to perform the essential functions of his job, he cannot establish that he was qualified under the ADA. *Id.* (affirming summary judgment against Americans with Disabilities Act plaintiff who failed to offer evidence of any reasonable accommodation that would have enabled him to perform the essential functions of his job). Summary judgment is warranted in Defendant's favor.

### ii.   Interactive Process

The parties dispute whether Plaintiff or Defendant terminated the "interactive process" in this matter. Defendant contends that Plaintiff unilaterally ended the interactive process and voluntarily resigned his employment. (Doc. 25-1, p. 13). Plaintiff responds that Defendant terminated the interactive process by failing to respond to Plaintiff's former attorney's letter to Defendant. (Doc. 26, p. 2–3). Regardless of whether Plaintiff voluntarily resigned or Defendant "chose to end the reasonable accommodation discussions with Plaintiff," the result is the same. Plaintiff was not a "qualified individual." *See supra*. The Fifth Circuit has held that "[w]hen a *qualified individual* with a disability requests a reasonable

accommodation, the employer and employee should engage in flexible, interactive discussions to determine the appropriate accommodation." *E.E.O.C. v. Agro Distrib.*, 555 F.3d 462, 471 (5th Cir. 2009) (emphasis added); *see also Chaudhry v. QuVa Pharma Inc.*, No. 4:19-CV-04179, 2021 WL 3631008, at *6 (S.D. Tex. Apr. 9, 2021) (internal citations omitted) ("The Court assumes without deciding that Plaintiff is a qualified individual with a disability and proceeds to determining whether QuVa engaged in the interactive process that led to a failure to accommodate Plaintiff.") ("When a qualified individual with a disability requests a reasonable accommodation, the employer and employee should engage in a flexible interactive process to determine the appropriate accommodation."); *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 224 (5th Cir. 2011) ("The plaintiff bears the burden of proving that an available position exists that he was qualified for and could, with reasonable accommodations, perform."); *Jackson v. Blue Mountain Prod. Co.*, 761 F. App'x 356, 359 (5th Cir. 2019) ("The ADA requires an employer to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.").

Summary judgment is warranted in Defendant's favor.

## B. Louisiana Employment Discrimination Law—Count III

The same result must be reached as to Plaintiff's failure to accommodate claim under the Louisiana Employment Discrimination Law. "Because of the similarities between the LEDL and the [ADA], Louisiana state courts and federal courts in the

Fifth Circuit rely on the ADA and interpreting federal jurisprudence in construing the LEDL." *Scioneaux v. Se. Grocers, LLC*, No. CV 18-5444, 2021 WL 2402100, at *3 (E.D. La. June 11, 2021), *aff'd sub nom. Scioneaux v. Se. Grocers, L.L.C.*, No. 21-30384, 2021 WL 5458118 (5th Cir. Nov. 22, 2021) (internal citations omitted). "To prevail on a failure-to-accommodate claim brought under either the LEDL or the ADA, a plaintiff must prove that [] she is a qualified individual with a disability . . . " *Huber v. Blue Cross & Blue Shield of Fla., Inc.*, No. CV 20-3059, 2021 WL 1023052, at *4 (E.D. La. Mar. 17, 2021) (citing *Feist v. La., Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013); *see also Claiborne v. Recovery Sch. Dist.*, No. 14-483-SDD-RLB, 2016 WL 3093926, at *3 (M.D. La. June 1, 2016), *aff'd*, 690 F. App'x 249 (5th Cir. 2017) (Both the ADA and the LEDL prohibit employers from discriminating against disabled individuals by failing to make reasonable accommodations for "qualified" disabled individuals). For the same reasons the Court granted summary judgment in Defendant's favor on Plaintiff's ADA claim, the Court grants summary judgment in Defendant's favor on Plaintiff's LEDL claim.

## C. Remaining Claims

Pursuant to the parties' stipulation, Plaintiff has abandoned all claims other than his "reasonable accommodation claim" under the ADA and LEDL. (Doc. 34, p. 2). Accordingly, the Court need not address the remainder of the parties' arguments

regarding Plaintiff's additional claims under the ADA, the Rehabilitation Act, and Title VII, as alleged in Counts I, II, and IV.[3]

## IV.    CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendant's **Motion for Summary Judgment (Doc. 25)** is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's claims against Defendant are **DISMISSED WITH PREJUDICE.**

---

[3] The parties provided the following in their Pretrial Order:

B. Abandoned Claims

Plaintiff's Position: In response to Defendant's Motion for Summary Judgment (R. Doc. 25), Plaintiff opposed the MSJ as to one claim – Plaintiff's reasonable accommodation claim under the Americans with Disabilities Act and Louisiana Employment Discrimination Law.

Defendant's Position: Plaintiff abandons his LEDL and Title VII discrimination claims and his ADA and LEDL constructive discharge claims. Plaintiff's only claims are for RA, ADA and LEDL failure to accommodate Plaintiff's alleged disability.

The foregoing admissions, having been made by the parties, and the parties having specified the foregoing issues of fact and law that remain to be litigated, this Pretrial Order shall supplement the pleadings and govern the course of the trial in this matter, unless modified to prevent manifest injustice.

A final judgment shall issue in accordance with Federal Rule of Civil Procedure 58.

Baton Rouge, Louisiana, this _2nd_ day of December, 2021

_____

**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

24